Filed 4/29/16  P. v. Ly CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B260496 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NO. GA086617) |
| v. | |
| HUNG VAN LY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Dorothy L. Shubin, Judge.  Affirmed in part; reversed in part with directions.

Dawn S. Mortazavi, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Timothy M. Weiner, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Hung Van Ly of assault with force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)),[1] among other crimes.[2] Defendant contends that the court erred by failing to instruct the jury on simple assault, a lesser included offense. He also challenges certain evidentiary rulings concerning the assault count. We agree with defendant that the failure to instruct on simple assault was prejudicial error and reverse the conviction of that count. His arguments regarding the evidentiary rulings are therefore moot. We otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

A.    *Prosecution Case: Overview*

In June 2012, defendant and Ha Sy had been in a dating relationship for about a year. At some point, defendant began exhibiting delusional behavior, which Sy attributed to defendant's drug use. In particular, defendant talked about "bad people" he believed were following Sy and who meant to harm her. He also falsely accused Sy of having another boyfriend whom he believed would hurt Sy. On one occasion, defendant held a closed pocket knife near Sy's neck as he demanded that she tell him the truth about a nonexistent boyfriend.

On June 5, 2012, at around 9:00 p.m., defendant drove to Sy's home and insisted that she get into his car, which she did. As defendant drove, he accused Sy of having a boyfriend, and said the boyfriend intended to hurt her. He told her to tell him the truth so he could protect her. After driving for about an hour, defendant parked in an empty

---

[1] All subsequent statutory references are to the Penal Code unless otherwise indicated.

[2] In addition to the aggravated assault under count 1, the jury convicted defendant of making criminal threats (count 2; § 422, subd. (a)), possession of methamphetamine (count 3; Health & Saf. Code, § 11377, subd. (a)), and possession of a device for smoking a controlled substance (count 4; former Health & Saf. Code, § 11364.1, subd. (a)). In a bifurcated proceeding, defendant admitted four prior convictions that qualified as serious felonies and strikes under the "Three Strikes" law. (§§ 667, subds. (a)(3), & (b)-(j), 1170.12.) He also admitted serving four prior prison terms. (§ 667.5, subd. (b).) The court struck three of defendant's prior strikes pursuant to section 1385, and sentenced him to 14 years 4 months in prison. The issues he raises on appeal concern only the aggravated assault count.

parking lot, where the two argued. At some point, a man drove into the parking lot and stopped near them. Sy made eye contact with the man and gestured to him to call for help. Defendant believed the man was Sy's boyfriend and a "bad person" who was going to harm Sy.

Sy made several attempts to leave the car, but each time defendant grabbed or pulled her back inside and closed the door. The two then "struggle[d]," "tussl[ed]," and "fought." During the incident, Sy's head hit the steering wheel and she suffered bruises to her face and arms. The evidence of this incident is set out in more detail below.

When Sy begged defendant to drive her home, defendant drove to his brother's house. There, he put Sy in a bedroom and held the door to keep her from leaving. Defendant and his brother argued and, eventually, the brother took Sy home.

The next morning, defendant went to Sy's house. Sy ran outside and asked someone to call the police. Defendant left the area before police arrived, and Sy returned home. Later that day, Sy applied for and obtained a temporary restraining order (TRO) against defendant.

On June 11, defendant knocked on Sy's door. Sy walked to a nearby park as defendant "tagg[ed] along." When they reached the park, Sy signaled to others to call the police. When police arrived, an officer searched defendant and found in one of his pockets a pipe for smoking methamphetamine and a baggie containing 0.15 grams of methamphetamine, which an expert opined is enough for at least 20 doses. Police took him into custody.

B.     *Evidence of the Assault*

Between the June 5 incident in the car and defendant's arrest on June 11, Sy told her sister-in-law, Vanessa Tang,[3] about the June 5 incident. Vanessa testified at trial about the conversation. Sy told Vanessa that she and defendant had been "fighting . . . back and forth in the car and her head . . . got slammed into the steering wheel." When

---

[3] Because there are two witnesses with the last name Tang, we will refer to them by their first names to avoid confusion. No disrespect is intended.

the prosecutor asked Vanessa if Sy told her how her head hit the steering wheel, Vanessa said, "Not in detail.  But it was, like, fighting back and forth inside the car."  After further questioning, Vanessa agreed with the prosecutor that Sy "said that her head hit the steering wheel during this struggle inside the car" and that Sy "didn't tell [her] how it [was] that her head hit the steering wheel."

After defendant was arrested on June 11, a police officer interviewed Sy with the help of an interpreter.[4]  According to the officer, Sy described the June 5 incident by stating that defendant "grabbed her by her hair from the back of her head and pulled her back into the vehicle" and then "smashed her face into the steering wheel."

At trial, Sy described the altercation in this colloquy:

"Q.    So did he pull you back into the car once or more than once?  [¶]. . . [¶]

"[A.]  Whenever I wanted to get to the door, he pulled me back.  [¶] . . . [¶]

"Q.    Okay.  And so how many times did he pull you by the hair back into the car?

"A.    The hair it was—it was once.  He was trying to grab my shoulder too.

"Q.    Then he pulled you by the back of your hair, what did he do?  After he pulled you back in by the hair, what did he do with you?

"A.    Then we sat there.  I'm trying to recompose, and after a while I ask[ed] him to drive me back.

"Q.    Did you tell the officer that while he held on to your hair he slammed your face into the car steering wheel?

"A.    Yes.  That was when he was grabbing my shoulder, and then somehow he grabbed hold of my hair too and then that was when my head hits the steering wheel.

"[¶]. . . [¶]

"Q.    The defendant caused your face to hit the steering wheel.  Is that fair to say?

"[¶]. . . [¶]

---

[4]  Sy speaks Vietnamese and Cantonese.

"[A.] Yes.

"Q. And he was holding on to the back of your hair when your face hit the steering wheel. Is that fair to say?

"A. He was holding my shoulder."

At another point in her testimony, Sy stated: "Well, it had happened inside the vehicle. I was really scared. But later on when I calm[ed] down, then I fought back. And then I realized that it was not him hitting me but rather we were pulling and, you know, struggling with each other."

When she was asked about a statement in her TRO application that defendant "grabbed my hair. Hit me," Sy testified: "Actually, he had not hit me, but they told me that if I did not write that down that he had hit me, they would not address them, and he would come back to harass me." She said she had been advised "to report [the incident] in a manner that would ensure his arrest." She further explained: "[A]ctually what happened was that in the struggle inside the car, I knocked my head against the car." She also described where her head "bumped onto the steering wheel."

Later, the prosecutor asked Sy about the written statement she provided to the police after defendant's arrest in which she stated that defendant "grabbed my hair" and "hit me." Sy responded by stating that defendant did not grab her hair or hit her; rather, "[h]e was dragging me by my shoulder" and "pulling" her. As with her TRO application, she explained that she wrote her statement to the police so that the police would arrest defendant.

C.    *Defense Case*

The defense presented two witnesses. A police officer testified that in February 2012 he responded to a call for assistance and saw defendant agitated, upset, nervous, and "mostly incoherent." Defendant tried to tell the officer that someone was after his sister and demanded to speak with her. Defendant then moved into traffic, removed his clothing, and yelled at passing vehicles.

Defendant's sister, Amy Tang, testified about an incident that took place a few months before the June 2012 incidents. Defendant arrived at Amy's home and appeared

5

nervous. He was acting "weird" and told her that he was there to protect her from "bad guys." Amy looked outside her house and saw no one. She said defendant had acted similarly on three other occasions.

D.    *Jury Deliberations*

The jury began deliberations at 9:00 a.m. on June 17, 2014. During the morning session, the jury twice requested and received readbacks of extensive portions of Sy's testimony, including the direct and cross-examination of her testimony regarding the June 5 incident. The jury reached its verdicts at 2:42 p.m.

## DISCUSSION

The District Attorney charged defendant with violating section 245, subdivision (a)(4): "[A]n assault upon the person of another by any means of force likely to produce great bodily injury." "Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate." (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 748 (*McDaniel*).) A lesser offense included within this manner of aggravated assault is simple assault—"an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240; *People v. Yeats* (1977) 66 Cal.App.3d 874, 879; *McDaniel*, *supra*, 159 Cal.App.4th at p. 747.) The trial court instructed the jury in this case on the charged crime, but not on the lesser offense.

In criminal cases, a trial court must instruct the jury on the general principles of law relevant to the issues raised by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) This obligation includes giving instructions on lesser included offenses, even in the absence of a request, when there is substantial evidence the defendant has committed the lesser offense and which, if accepted, would absolve the defendant from guilt of the greater offense. (*Ibid.*; *People v. Waidla* (2000) 22 Cal.4th 690, 733.) Substantial evidence in this context is evidence from which a jury comprised of reasonable persons could conclude that the lesser offense, but not the greater, was committed. (*Breverman*, *supra*, 19 Cal.4th at p. 162.) Thus, the court in this case was required to instruct on simple assault if there was substantial evidence that defendant

6

committed an assault, but not an assault by means of force likely to produce great bodily injury. (See *McDaniel*, *supra*, 159 Cal.App.4th at p. 748.)

The evidence of the June 5 incident supports alternative conclusions. After defendant's arrest, Sy told a police officer that defendant "grabbed her by her hair from the back of her head" and "smashed her face into the steering wheel." The jury saw photographs of bruises on Sy's face and arms, which we have also reviewed. Vanessa testified that Sy told her that her head was "slammed into the steering wheel" during the fight. Such evidence reasonably supports a conclusion that defendant committed the charged offense of assault with force likely to produce great bodily injury.

At trial, however, Sy described the event in less violent terms. Indeed, her testimony indicates that she initially made the incident appear more violent than it was because she wanted to obtain a TRO and ensure the police arrested defendant. She denied that defendant hit her, and, instead of her head being "smashed" against the steering wheel, she stated that her head "bumped onto the steering wheel," and, "I knocked my head against the car." She also rejected her prior statement that defendant was holding on to the back of her hair when her face hit the steering wheel, and clarified that "[h]e was holding my shoulder." More generally, she described a "struggle" between them, with defendant "pulling" and "grabbing" her shoulders to keep her from leaving. When Sy "fought back," her head hit the steering wheel as they "struggl[ed] with each other." Her testimony, "I knocked my head against the car," suggests that her injuries were an unintended consequence of their "back and forth" struggle, and not necessarily indicative of the force defendant used. (See *People v. Duke* (1985) 174 Cal.App.3d 296, 302 [the issue is not whether the defendant caused serious injury, but whether the force used was such as would likely cause it].)

Viewed in its entirety, Sy's testimony supports a conclusion that defendant did not hit, slam, or smash Sy's head into the steering wheel, but rather grabbed and pulled her shoulders; and during the struggle, Sy inadvertently hit her head on the steering wheel. In this scenario, defendant assaulted Sy, but not necessarily with force likely to produce great bodily injury. The court, however, did not give the jury the opportunity to

7

decide whether defendant was guilty of simple assault and only presented the jury with "an unwarranted all-or-nothing choice" between conviction of aggravated assault and complete acquittal. (See *People v. Wickersham* (1982) 32 Cal.3d 307, 324.)

When the court fails to instruct on a lesser offense, reversal is not required "unless an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*Breverman*, *supra*, 19 Cal.4th at p. 165.) Here, the jury reasonably could have rejected Sy's initial statements about the incident as embellishments employed to support her efforts to obtain a TRO and ensure defendant's arrest. If the jury also believed Sy's trial testimony, it reasonably could have concluded that although defendant assaulted Sy when he pulled and grabbed her to keep her from fleeing, he did not use force likely to produce great bodily injury. The fact that the jury requested two read backs of Sy's testimony regarding the assault suggests that the jury considered the matter to be a close case. (See *People v. Lacefield* (2007) 157 Cal.App.4th 249, 262, disapproved on another point in *People v. Smith* (2013) 57 Cal.4th 232, 242; *People v. Fuentes* (1986) 183 Cal.App.3d 444, 456.) Based on our examination of the entire record, we conclude that if the jury had been given the alternative of convicting defendant of simple assault, there is a reasonably probability it would have done so. We therefore reverse the conviction on count 1.[5]

"When a greater offense must be reversed, but a lesser included offense could be affirmed, we give the prosecutor the option of retrying the greater offense, or accepting a reduction to the lesser offense." (*People v. Kelly* (1992) 1 Cal.4th 495, 528.) Under circumstances similar to those presented here, our state Supreme Court gave the following directions to the trial court: "If the People do not bring defendant to trial within 60 days after the filing of the remittitur in the trial court pursuant to . . . section 1382, subdivision [(a)(2)], the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction of [the lesser offense]

---

[5] Defendant challenges two evidentiary rulings, both of which pertain only to the aggravated assault count. Because we reverse the conviction on that count, we do not address the evidentiary issues related to that count.

8

and shall resentence defendant accordingly." (*People v. Edwards* (1985) 39 Cal.3d 107, 118.)  Our disposition will follow this example.

## DISPOSITION

The judgment as to count 1 is reversed with the following directions:  If the People do not bring defendant to trial within 60 days after the filing of the remittitur in the trial court pursuant to section 1382, subdivision (a)(2), the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction on count 1 of assault under section 240 and resentence defendant accordingly.  The judgment is otherwise affirmed.

NOT TO BE PUBLISHED.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

LUI, J.

9